Good morning. I'm William Davis. I'm here for the appellants, collectively referred to as Alpha III. I'd also like to reserve a few minutes for rebuttal as well. A change of pace, a civil case. This case was dismissed on the pleadings by the district court. Primarily it appears to us that it was done so because the district judge went far beyond the usual review of construing what was actually in the complaint and construed it in favor of the plaintiff and not requiring a heightened pleading standard. In fact, going well beyond that, beyond even the summary judgment standard, essentially weighing what little evidence we had at that point because we were at the pleading stage. So what happened was the district judge, although he pled that there was a pattern in practice in San Diego of excluding or first agreeing to do literally everything that the city's planning task force wanted done and then what they wanted done was all low-income housing to be excluded from the City Heights neighborhood. They simply didn't want any, I think they called it tax credit or bond-assisted financing in City Heights. What the district judge did was, although we had three instances at that point of supporting the pattern in practice theory of the case, the district judge essentially disputed whether there was a pattern in practice, said those were all different, even though they'd occurred at the same time. They'd occurred over some span of time, a couple of years' worth of time, and disputed that the evidence that we already had, which was attached to the first amendment complaint, which was an email or a transcript of an email that came to us through another client who had a similar problem, it was one of the instances we were referring to in the complaints, and in that email that was very specific was actually crowing to the second developer, KB2S, that they never really had a chance to have their development approved because they had already, the task group had already advised the city they didn't want any tax credit projects there. So based, apparently just disputing that, the district court held that these incidents that we pointed out as part of the pattern in practice were simply discrete and separate and didn't support the policy in practice, even though the case law appears to be exactly the opposite. For instance, we cite the U.S. versus Habersham properties case, which cites U.S. versus Bob Lawrence, and the quote from that case, there is no threshold number of incidents that must occur before a plaintiff can bring a suit against a party alleging pattern in practice. And in fact, in Ballesteri, although our case was set, it was a jury request, the case says the determination of whether the evidence indicates a pattern in practice of discrimination is ordinarily a question of fact for the jury, but that's certainly not the treatment we got in this case. The other point that I would make in connection with the dismissal on statute of limitations grounds is that the city and Boston Capital focused on the idea that in terms of the regulatory agreement which adopted these covenants, which burdened this low income development financially, in fact required it to essentially be rebuilt in the middle of construction. Their position is that we knew or should have known that those covenants were adopted and knew or should have known that they prejudiced us in some way. Now, of course, we by then had been ejected from the partnership, Alpha Hab, by Boston Capital at the behest of the task group in the city, so we would have had no way to have done that, but more importantly, in a case of inland mediation, which the defense all cited, they indicated in that case that this court's opinion in Morgan versus Amtrak, which was not affected by the subsequent Supreme Court decision, indicates that Morgan says, the circuit opinion says, this court has never adopted a strict notice requirement as a litmus test for application of continuing violation of doctrine. And they did it in connection with disapproving a Seventh Circuit case that seemed to suggest that the doctrine does not apply with the discriminatory nature of the acts. The discriminatory acts was apparent at or about the time they were committed. So it appears they've applied the wrong standard. Also, the covenant cases... I'm sorry? Does the Morgan court pertain to the housing act? No. So Title VII employment case. And what authority do you have that we ought to translate it then into the Federal Housing Act? I'm not suggesting that you should. That's actually the defendant's suggestion. It's not ours. Ours is that Title VII jurisprudence oftentimes is imported into Title VIII, but there's good and valid reasons for not doing that in this particular factual context, in which we're talking about a development which, over a period of time, goes through various government offices, various government reviews. And at any given time, if a government official simply let an application stay too long on their desk one day too much, and because of that, you know, the project was lost, that could, you know, state a cause of action. Although in the usual context, you don't know whether it will or not. And, in fact, this case is just like that. We lost the 9% credits due to delays we believe attributable to unlawful motives. But there was coverage. The client went ahead with Boston Capital's consent, reapplied for a different type of financing, and had that all done until we hit this problem of the Tefra review and the task group's policy again coming into play there. What's the status of Fox Hollow today? It is no longer called Fox Hollow. I believe it's called Hollywood Palms. The task group wanted it renamed. They wanted everything to do with Alpha gone. But it exists, and it is up and running, as I understand it. Pretty much as originally contemplated? No, not as originally contemplated. It was, as I noted, rebuilt substantially, changes in the footprints of buildings, downsizing of certain areas. What about the occupants, the nature of the occupants? The nature of the occupants? No. I believe that's probably consistent with what it would have been had there been no additional renovation costs. The additional $6 million had never been imposed. And what happened in terms of the new obligation, what I'll call revenue sharing, taking part of the... I'm sorry, Judge. After the Tefra review, were there not additional requirements imposed on the project? Yes, that's what we refer to as the regulatory agreement, which is, I believe it's Exhibit A to our First Amendment complaint. And the new project satisfied those, or the revised project went ahead with those as part of the project. Well, what happened was we were out of the partnership. We were rejected because the task group wanted us out. Boston Capital's people apparently negotiated with the task group, the Tefra hearing, said, We'll give you conditional approval, but you have to meet every condition these people want. And then Boston Capital proceeded to do just that. What they wanted was a complete redesign of the building. We're talking about a multiple building development, 130-plus units, I believe. And they wanted different roofs, which may have had structural implications, all sorts of different paving. They wanted special heating systems, all sorts of things. It appeared to me, it appeared to us, that all that was done in an effort to try and increase the costs of the development. Therefore, they thought that would change the rental mix, which, of course, contractually it did not do. I hope that was responsive to your question. The point that I was... Is there an entire theory that the city disfavored low-income housing? Not disfavored, excluded it from City Heights. So how is that consistent with the current status of Fox Hollow, as it now exists? I keep using that name. I mean, it's built. Well, it was a vested development for land use purposes at the time. Is it a low-income housing development? Yes. That's my understanding. Just as an atmospheric, doesn't that impeach your theory? No. Why not? Well, because they added $6 million worth of additional costs to it because it was a low-income development. And state law is explicit that you're not supposed to do that, or burden a development in that way. We won't have much low-income housing if that's to be the rule. And certainly it's at odds with this court's prior jurisprudence in U.S. v. Hayward, where there was an additional fee apparently imposed without a corresponding reduction in expense. That was held to be a violation of 3617. San Pedro Hotel, where there were additional costs imposed and delay costs and so forth, we were allowed to pursue that claim for that reason. This was an enormous rebuilding of the development in the middle of construction. And although the housing is there and exists, which is Boston Capital's view that no harm, no foul, it's there, the problem is it can't exist as low-income housing unless someone paid this additional $5 or $6 million, which is why Boston Capital sued Alpha to get that money. They put it out apparently. They agreed to advance it. And then later, for whatever reason, they decided we were responsible for paying it. And you had a one-month trial in state court, and you lost. There was a trial. I don't know if it lasted that long. It was a lengthy trial. It was a judge-tried case. That presently is on appeal. It's fully briefed. There has not been an argument on it. There's not a final decision in that case. Interestingly enough, the trial judge there ruled, as I understand his ruling, that everything the city did in harming aggressive development and in rebuilding a low-income development midstream simply because it was a low-income development, that all that, in fact, was irrelevant to the issue of whether Alpha had met the 9% placed-in-service requirement at a certain date and refused to look at that issue. The point I was going to make about the covenants is that it appears that the statute of limitations on a covenant begins running actually at the time there's a demand for enforcement of it, not when it's adopted, which was the defendant's position. And also, in looking at this further, it occurred to me that that has to be the rule here as well because you simply wouldn't be able to have injury in fact until they did impose it. Jurisprudence as being the mere existence of a covenant which has not been applied to you doesn't give rise to any particular injury. So in this instance, it illustrates that until there was a demand for performance, i.e., for us to fund the covenants, there, in fact, was no injury in fact. We couldn't have sued under the Fair Housing Act anyway. So the statute couldn't have run from the adoption of the covenants, which they say we should have known about or something. It would only run from when it was actually applied to us, which didn't occur until quite a bit later. Counsel, if you're going to save some of your time for rebuttal, I'd like to hear about the Nora Pennington doctor. Right. I was just coming to that, Your Honor. Much has been made of that in this case, which was filed some time ago now. And as Your Honors know, that's a rapidly developing area and a complex one. The first point we would make is that Boston Capital was sued for the demand or making the demand of us of the financial nature for the money to fund the covenants. And as I pointed out in the U.S. Hayward, I believe that is sufficient right there to support an interference claim. The other issue is we were ejected from the partnership, we believe unlawfully, which implicates breach of fiduciary duty and breach of contract and some other causes of action. It would have nothing really to do with Boston Capital's suit. The suit itself. Our objection on the Nora Pennington thing is really at this point that it was applied too early before more was really known about the case. Although it is not clear, I think, under the law precisely when the Nora Pennington analysis is supposed to be made. Some judges do it post-summary judgment. White v. Lee, I believe, was at summary judgment. I think inland mediation declined to do it until after summary judgment, I believe. U.S. v. Wagner looked at covenants that were unenforceable under state law, and that was after a trial. So our problem was that we pled something which implicated Nora Pennington, and the next thing we knew, we were gone. I don't understand that argument, counsel. You were dismissed on a 12B6 motion, weren't you? That's correct. And the court had before the decision of the state court, and if you needed to meet an objectively baseless was the test that the judge was using, with the result of the state court litigation, she would be in a position to make that decision, regardless of where it is in your lawsuit, filing, discovery, the eve of trial. I understand that argument, and there are cases which suggest that where there is a ruling garnered from some court, giving some credence to the lawsuit, that that's sufficient. The problem really is, and then there's that exception involving fraud on the court and so forth and so on, the problem really is here that the trial judge relied on this tentative ruling, which never actually considered the issue we're talking about, which is the issue of objective baselessness based on the violations of state law. And what happened to that tentative ruling ultimately? I'm sorry? What happened to that tentative ruling ultimately? Well, I believe some version of it was entered eventually. That's what's on appeal. Do you want to save your last five minutes? Yes, Your Honor. Good morning, Your Honors. May it please the Court. I am Maria Severson for Appalachia City of San Diego. I will just be discussing today the issues regarding the statute of limitations and leave for the remaining 10 minutes out of the 20 to counsel for Boston Capital to address Norah Pennington and other remaining issues. The district court's dismissal of the appellant's first amended complaint was proper because the claims pertained to individual discrete acts that were time barred at the time the complaint was filed. The first claim involves the delay in the processing of permits and construction. The result was that Alpha 3 lost the project, allegedly because of the city's acts. The appellant, Alpha 3, had obtained tax credits, which required the project to be placed in service by December 31, 2000. Alpha 3 released the reservation on the tax credits in mid-December because it did not meet the construction deadlines. To the extent any of Alpha 3's failure to simply timely construct a project with the city's, the statute of limitations runs two years to the extent it's based on Fair Housing Act violations. Therefore, Alpha 3 would have had clearly just two years from December 31, 2002 to file the lawsuit. The other actions, which is a discrete act alleged by Alpha 3, was the conditions placed on Fox Hollow. First of all, those conditions were placed by the city council acting as a housing authority, and those regulations were embodied in August 2001. Alpha 3 had already been served of notice that because of their failure to place the property in service by December and thus their loss of the tax credits, they were going to be removed as general partner. The bottom line is, as of August 2001, the regulatory agreement was enacted, which listed the different covenants that the property must comply with, which I invite the court to peruse because it all has to do with just making the place livable and aesthetically pleasing. How does the new requirement of 20% of income to the community trust fund operate? What's the purpose of that? Well, that is to the community trust for affordable housing. So again, plaintiff's own complaint, the complaint and the First Amendment complaint, as well as the attachments, which include the regulatory agreement and the covenants, indicate that one, as this court pointed out when questioning appellant's counsel, the property was in fact built as affordable housing. There was no discriminatory impact because the property sits today and will for 55 years as intended by appellants as affordable housing. And to the extent that there is any fee associated with the further advance of affordable housing, that also negates any argument of plaintiff. What we have is discreet acts, and we don't even have a discriminatory impact. The only impact appellant feels is their failure to develop a property and now seeking redress from everybody, Boston Capital and the city, to recover the cost that it lost. And that's what we have here. Appellant's alleged harms are discreet acts and their time barred. That's pretty clear from the case law that's been cited by the brief. Discreet acts, even if they were undertaken to some alleged policy of discrimination, does not extend the statute of limitations where they only occurred inside or outside the statutory period. Counsel, I'm going to change your format a little bit. It strikes me that you've got two direct claims. You've got a retaliation claim, which is a direct claim, and you've got the claim on behalf of the Fox Hollow residence, and that's a direct claim. Then you've got the third claim, which is indirect injury to all developers. Do you understand my framework? I do, but I don't think that's what was pled in the First Amendment complaint.  Why is the indirect injury claim one of the claims that was dismissed by the court on statute of limitations? The indirect injury claim is that the city, because it has a policy, has a negative effect in that the city does not allow affordable housing in the Sydney Heights area. Plaintiff's First Amendment complaint with the attachments as contained in the regulatory agreement showing proof that the property is acting as affordable housing belie that. But wasn't it the basis of the dismissal was not on the merits. It was on the statute of limitations, wasn't it? It was on the statute of limitations based on that these are discrete acts. So what is the statute of limitations that's applicable to that indirect injury claim? The indirect injury that, while alleged in the pleadings, is actually... We're on a 12B6 standard, which we have to accept all of the facts in the complaint as true. Yes, but what the court does not have to do is accept unreasonable factual inferences. Here, simply because plaintiffs or appellants state in their First Amendment complaint that the same acts that were alleged in the original complaint of the delay and the regulatory agreement, that those were discrete acts, now suddenly they have the words overarching policy, yet they include as part of their factual basis the fact that an act, a fact in furtherance of that policy that there's no affordable housing is belied by other facts alleged in the regulatory agreement showing that the property is developed. I appreciate your answer. Let's stay on my question. What is the statute of limitations to the indirect injury claim? The indirect injury being that there is... To all developers. To all developers? Throughout the area. Well, the statute of limitations, to the extent that there's a continuing violation or policy of the city, would be within two years of the date of the last occurrence. And what we have here is the occurrences alleged in the First Amendment complaint are the delay, the regulatory agreement, and the KB2S property, which is a completely different developer and a different housing project where we don't really know the facts that are alleged therein. Isn't it occurrence or termination of the unlawful practice? Isn't that the actual language? That is correct. And isn't the appellant in this circumstance alleging that the claim is timely because it's within two years of the termination of the occurrence? In fact, I'm not sure they're even contending there was a termination since they see it as a continuing policy. Well, what we have here is them trying to bootstrap KB2S, saying, look, hey, we filed another lawsuit here, so that, mind you, if you look at the date, it's close in time to when the First Amendment complaint was going on. That basically KB2S now will save us because we're going to use that as a factual allegation to show that there is a policy. But let's look at what they alleged before it, discrete acts and then the actual development of an affordable housing property. So really what you have is to the extent they're alleging a policy of lack of affordable housing in City Heights, all you really have is the one allegation of KB2S because the other property was built. So while their case law does say there's no magic number, there's no threshold number, sporadic instances, you cannot meld them together to form a continuing violation theory just to save your complaints when clearly you're talking about discrete acts. And the reasonable inferences that the Court is permissible or permitted to draw on is that there aren't – there is no continuing violation because the property was developed as affordable housing. So your defense on that point, then, really, you would concede that it would not be timely, that the statute would not have run, but for the fact that you ask us to draw these, to depart from the 12B6 standard and instead say reasonable inferences can be drawn, look at other facts, and therefore determine that there was no such policy. It's like a summary judgment. Well, under the case law in Sprewell, the Court indicates that reasonable inferences – unreasonable inferences do not have to be accepted based on just conclusory pleadings. So actually, I'm not asking you to decide the case on the merits. What the city is asking this Court to do, as we did the lower court, is look at the allegations in the complaint, look at the attachments, which is a regulatory agreement, and see that there is just a project that didn't get developed. The claims are that the city, that it did certain acts in the furtherance of some alleged policy, and notwithstanding, the property is built. Okay. I understand the argument. That brings us to about halfway through.  And I'll defer to you. Right. Thank you, Your Honor. Thank you. Good morning. May it please the Court. Michael Strube, on behalf of all of the appellees, other than the City of San Diego, referred to as the Boston Capital Parties. I want to address the two barriers that preclude the Ashley Party's Fair Housing Act cause of action against Boston Capital as a matter of law, the Norr-Pennington Doctrine, and the statute of limitations. But before I get to those legal theories, I want to point out precisely how narrow the allegations are in the first amended complaint against the Boston Capital Parties. The Boston Capital Parties are alleged to have done four things. Number one, they entered into a partnership agreement with certain of the Ashley entities at some point prior to December of 2000. Number two, in April of 2001, they allegedly ousted the Ashley Parties from that partnership. Number three, the Boston Capital Parties agreed to the imposition of certain additional changes to the project at the request of the City of San Diego and the City Heights Community Task Force. Those changes are reflected in a regulatory agreement that's dated August of 2001. Number four, Boston Capital is alleged to have sued the Ashley Parties to recover for the breach of contract that occurred when the Ashley Parties failed to put the project in service in December of 2000, which caused the project to lose its federal subsidy in the form of 9% tax credits. Boston Capital is not alleged to have had anything to do with KB2S or anything other than those four things. And of those, the only event that occurred within two years preceding the date of this lawsuit, in this case, was the filing of the state court lawsuit against the Ashley Parties. And that lawsuit cannot form the basis for a Fair Housing Act claim under the Norr-Pennington Doctrine. The Norr-Pennington Doctrine is a principle of statutory construction, which says that when looking at a federal statute, it should be construed to avoid infringing on the litigant's rights under the petitioning clause of the First Amendment. And as we know from Judge Reinhart's opinion in White v. Lee, that Norr-Pennington Doctrine applies specifically to the Fair Housing Act. And as we know from White v. Lee, as well as from the United States Supreme Court opinion in California Motor Transport, the filing of a lawsuit is presumptively entitled to immunity under the Norr-Pennington Doctrine. So in order to avoid Norr-Pennington immunity at the pleading stage, what the litigant must allege is facts sufficient to justify a discovery record to establish the sham exception, the sham litigation exception, to the Norr-Pennington Doctrine. And Your Honors asked the question previously, well, this is at the 12b6 stage. This Court has repeatedly affirmed decisions at the 12b6 stage of district courts rejecting claims by litigants based on petitioning activity. Most recently was in the Sosa v. DirecTV case. And in that case, there were letters that were sent out by DirecTV to purchasers of smart cards. And DirecTV sent thousands of these letters. And in them they said to these purchasers of these smart cards, we know you're piloting our signal. We demand that you pay us money. And if you don't, we're going to sue you under the civil law and we're going to prosecute you under the criminal law. And at the 12b6 stage, this Court held that that was protected activity under the Norr-Pennington Doctrine and that sending of the demand letters was not objectively unreasonable. And the reason why this Court can reject such a claim at the 12b6 stage is because the threshold for the sham litigation exception is very high. What the litigant must show is two things. First of all, that the activity, in this case the lawsuit, was objectively baseless. And number two, that the lawsuit was filed with an improper, subjective intent. And on the objectively baseless prong, and again I return to Judge Reinhart's opinion in White v. Lee, as well as Professional Real Estate Investors v. Columbia Pictures, the United States Supreme Court opinion, to show objective unreasonableness, it must be established that no reasonable litigant could have realistically expected to obtain a favorable recovery in the lawsuit. And again, returning to White v. Lee, it is only if a lawsuit is found to be objectively unreasonable that the subjective motive of the litigant is even considered. That is, an objectively reasonable lawsuit cannot, as a matter of law, be the basis for a Fair Housing Act claim regardless of the subjective intent of the individual that filed it. So, considering that threshold, that is why at the pleading stage this Court has dismissed these types of claims. And in this case, what is pleaded about this lawsuit? It's pleaded that Boston Capital prevailed. Why don't you move on to your next point, then? I think you made your first point. Okay. Thank you, Your Honor. The next point I want to address is the statute of limitations because this Court had raised a couple of questions that I think I can address. First of all, Judge Robart, you asked, why is it that the Morgan Doctrine applies to a Fair Housing Act claim? Because that's an employment context. That's correct, Your Honor. However, the Morgan Doctrine is a... it's a pronouncement concerning the continuing violations doctrine. And the continuing violations doctrine originated in Title VII in the Ricks case, the Delaware State College v. Ricks case. So what we have here is this evolution. Ricks announces the continuing violations doctrine in the United States Supreme Court. Then in Havens v. Coleman-Whealty, which was a Title VIII case under the Fair Housing Act, the continuing violations doctrine is used in the context of the Fair Housing Act. Then we go back to Morgan, which is again in Title VII, talking about the continuing violations doctrine. And this Court in Chorosky v. Henderson held, and that is at 330 Fed 3rd at 1246 footnote number 3, held that the analysis of the continuing violations doctrine applies to other civil rights cases. And in fact, both before and after Havens, federal courts have repeatedly applied the continuing violations doctrine, as announced in Morgan, to the Fair Housing Act. And we cite those cases in our brief. They are district court cases. There are not cases from this circuit. But I would also point out that in the recent case of Stanley v. Trustees of California State University, this was decided this year. It was after our brief. It appears at 433 Fed 3rd, 1129. In that case, the Court applied the continuing violations doctrine, as announced in Morgan, to a Title IX case. So what we have is consistent application of the Supreme Court's pronouncement in Morgan in Title VII, in Title VIII, in Title IX, and we have Cherovsky's teaching that this continuing violations doctrine under Morgan applies generally to civil rights cases. Then I would also point out, Your Honor, Judge Trott, I believe you asked the question, what is the status of the project as it relates to low-income residents? That is reflected in, at tab number 5 of our request for judicial notice, the project is, as it relates to low-income tenants, is precisely the same as it was before agreeing to the covenants by the city. The final thing on the Fair Housing Act, I'm sorry, on the statute of limitations that I do want to point out, however, is that I don't believe that this Court even needs to reach the issue under Morgan as to whether this was a continuing violation. Because if you go back to Havens, remember in Havens there were two forms of alleged discriminatory conduct. There was the denial of an integrated neighborhood. And then, second, there was the providing of false information to tenants. And as to that second claim, what happened was Mr. Willis went and was told that no apartments were available for black residents and apartments were available to white residents. That was within the limitations period. Ms. Coleman, Sylvia Coleman, did the same thing on four occasions, was told that no apartments were available. All of those were outside the limitations period and the Court said that those claims were time-barred. Those were discrete acts and she could not bootstrap her claim for being provided false information to the fact that Mr. Willis was provided false information. And that's precisely what the Ashley parties are trying to do here. They're saying that because in KB2S that project was not permitted to develop in City Heights, therefore we should go back and look at the Fox Hollow project and bring that one in tagged to the KB2S, which is the only timely one. And you don't even need to reach the continuing violations doctrine under Morgan. Under Havens, those are two discrete acts and the only party that could bring a Fair Housing Act claim based on those discrete acts is the one that had a violation that was within the limitations period and that would be, for example, KB2S. So unless the Court has any further questions, I'll submit. Thank you, Kevin. Thank you, Your Honors. Thank you, Your Honors. The first thing is that we plead pattern in practice, but we also offer some proof of it. The Varnador email clearly says that the City Heights task group, which the City is part of, has a policy of excluding low-income development from that area. That's what it says. Why we would have to do more than that at the pleading stage, I don't see how we would under the case law. I can't figure that out, actually. As to Boston Capital's point that there were no acts within the two-year period, I believe that to be clearly incorrect. Not only do we have the demand for performance or funding of the covenants, which, as I pointed out earlier, doesn't run until the demand is made, which would be in the two-year period, but we also had... which, in effect, was enforcing the City's policy as well, which puts them in with the City. So it's not merely just our allegation about the pattern in practice. There is actual evidence that supports that, and it certainly implicates Boston Capital as well in their demands as well, as I pointed out earlier. They've tried to immunize everything with the Norr-Pennington and have that just expand to include absolutely every act. Even the case they rely on, the Sosa case, which deals with a complicated sort of RICO matter, the Court spent a lot of time working through that to try and figure out, and as I understood it, decided that the presumption is that the Norr-Pennington doctrine is to be reconciled with other statutes, not simply to swallow them all up so that nothing exists of prior conduct, prior to the lawsuit being available for action. And in this instance, I mean, the question is, I guess, whether anything survives under 3617. If Mr. Stroob is correct, nothing does, I guess. Even the demand for money, enforcement of covenants and so forth simply wouldn't survive because that would all be insulated as pre-litigation sort of threats and so forth. I don't believe the law is that broad in that area, nor do I think that would be sound policy what Congress had in mind, certainly with 3617. In fact, in U.S. v. Scott, there's a discussion in there about Congress's interest in dealing with the covenant problem, covenants that were enacted that have discriminatory impact or effect and intent. And then lastly, the case law pertaining to Morgan. Morgan itself specifically says it does not apply to pattern and practice cases, as does Cherovsky, actually. It says the same thing. So we don't think those are applicable for that particular reason. In elegy to Havens, we think supports only us because in Havens you have a series of testers, different races and so forth, trying to get information concerning apartments. And basically the specific holding was is that if there is a policy to exclude African Americans, for instance, then you can attack that even if some of the acts there ordinarily would have been time-barred if that's the policy that you're attacking. That's analogous to what we've done here. We have evidence that there's a policy excluding low-income developments from City Heights. And what happened was two successive developers tried to develop low-income housing there. One was only allowed to if $6 million of additional fees and so forth and exactions were paid. $6 million represents what? I'm sorry, that's the cost of compliance with the covenants, according to Boston Capital's claims against Alpha. Does that have anything to do with the 20% that goes to the community? Yes, that's part of that, yes. What's that community trust for? I really don't know its purpose in point of fact. It's my understanding that the City Heights task group from taking a deposition in a related case indicates that they have a lot of control over how that money gets spent and what they do. Isn't it supposed to go to support low-income housing? Well, the cities have vast funds that are for that purpose, many of which are not used for that purpose, but I believe that's the stated or legal purpose, yes. I think that's right. I guess with that I've finished. Thank you, Kevin. The case just argued will be submitted. The court will take a brief recess for the morning. Brief morning recess. All rise.
judges: Reinhardt, Trott, Robart